UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,  )
                           )
            Plaintiff,     )
                           )  No. 12 CR 426-2
      v.                   )
                           )  Judge Rebecca R. Pallmeyer
JUAN MONTOYA-HERNANDEZ,    )
a/k/a Carlos,              )
                           )
            Defendant.     )

## MEMORANDUM OPINION AND ORDER

Defendants Juan Montoya-Hernandez (hereinafter "Montoya"), J. Inez Rodriguez, and Shawn Johnson are charged in a four-count indictment with marijuana trafficking. Johnson, who acted as a courier for his alleged co-conspirators, has pleaded guilty pursuant to a cooperation agreement. Montoya-Hernandez and Rodriguez will proceed to trial. Montoya moves to suppress evidence seized by DEA agents pursuant to an anticipatory search warrant, and post-arrest statements that Montoya claims were the product of coercion. Rodriguez asks the court for a severance.

Earlier this year, the court conducted an evidentiary hearing on Montoya-Hernandez's motion to suppress. For the reasons explained here, that motion is denied in part and continued in part. Defendant Rodriguez's motion for a severance is denied without prejudice.

**I.     Motion to Suppress Physical Evidence**

In its investigation of this case, the government worked with a confidential source (the "CS") who had been obtaining marijuana from Defendant Rodriguez. Special Agent Todd Smith, a group supervisor for the DEA (Evidentiary Hr'g Tr. 80, June 19, 2013), testified that on May 30, 2012 the CS had conducted a "controlled buy" of 25 pounds of marijuana from Defendant Montoya, using $5,000 in "DEA official advance funds." (Tr. 78, 83.) According to Smith, at Rodriguez's direction (and under DEA surveillance), the CS met with Mr. Montoya at a

Wendy's Restaurant (DEA Rep. of Investigation of 05/31/2012, Ex. A to Def.'s Mot. to Suppress [82], hereinafter "5/31/12 Rep.," ¶¶ 4, 22-25), and turned his vehicle over to Mr. Montoya. Mr. Montoya drove that vehicle to the Montoya home in Crown Point, Indiana, entered the garage, "off-loaded the money from the trunk of the vehicle, and then loaded it with 25 pounds of marijuana." (Tr. 78.) When Mr. Montoya returned the car to the CS, it had been loaded with 25 pounds of marijuana in five-pound bundles, and the cash had been removed. (5/31/12 Rep. ¶ 42.)

Monitored by agents, the CS negotiated another marijuana transaction just a few days later. Expecting this transaction to unfold in the same manner as the episode on May 30, on June 5, 2012, agents obtained an anticipatory search warrant for the Montoya residence at 10505 Lane Street in Crown Point, Indiana. (Tr. 78-79.)

"Anticipatory warrants differ from other search warrants in that they are not supported by probable cause to believe that contraband exists at the premises to be searched at the time they are issued." *United States v. Dennis*, 115 F.3d 524, 528 (7th Cir. 1997). Instead, the court can issue an anticipatory warrant when the government establishes probable cause to believe that contraband will be located at the target premises after specified triggering events occur. *Id*. "Thus, conditions precedent to the execution of an anticipatory warrant are integral to its validity." *Id*. To avoid premature execution of an anticipatory search warrant, it must be conditioned upon the actual arrival of contraband at the residence to be searched. *United States v. Brack*, 188 F.3d 748, 757-58 (7th Cir. 1999) (citing with approval *United States v. Ricciardelli*, 998 F.2d 8, 13 (1st Cir. 1993) ("[T]he event that triggers the search must be the delivery of the contraband to the premises to be searched.")).

In this case, the warrant application described the events of May 30, 2012 and phone conversations between the CS and Montoya. Magistrate Judge Anthony Rodovich reviewed the application and authorized a search of the Montoya residence on the occurrence of these

conditions: "Rodriguez, Montoya-Hernandez, or another individual, at Rodriguez's direction, takes CS-1's car and travels to [Montoya-Hernandez's residence in] Crown Point, IN in order to supply CS-1 with additional quantities of marijuana." (Appl. and Aff. for Search Warrant, Ex. C to Def.'s Mot. to Suppress [82], at 12-13.)

On June 7, 2013, those precise events occurred. The CS arranged to meet Mr. Montoya at the Menard's parking lot in Merrillville, Indiana that afternoon to obtain more marijuana. (Tr. 82.) The CS drove his vehicle, with "$27,000 of sham U.S. currency in the trunk" to Menard's, having arranged to have his vehicle taken to a "second location, loaded with marijuana, and then brought back." (Tr. 82-83.) While the CS was waiting, Mr. Montoya advised the CS by phone that another individual would meet him there instead. (DEA Rep. of Investigation of 6/11/2012, Ex. E to Def.'s Mot. to Suppress [82], hereinafter "6/11/12 Rep.," ¶ 17.) At 2:15 p.m., a brown Chevrolet Silverado drove into the parking lot. Agents observed the driver, later identified as Shawn Johnson, exit the truck and exchange keys with the CS. (*Id.*) Johnson drove the CS's vehicle from the Menard's parking lot in the direction of Mr. Montoya's home in Crown Point. Johnson drove the CS's vehicle just past the Montoya home and pulled into the driveway of the adjacent property. (*Id.* ¶¶ 22-23.) Then, as he put the car in reverse in an apparent effort to turn around, agents arrested Johnson and executed the search warrant, finding some 900 pounds of marijuana in the Montoya garage. (*Id.* ¶¶ 23-25.) Agent Smith testified that, in executing the warrant, he entered the garage, where he observed a bag containing 50 pounds of marijuana in the north end and additional bundles of marijuana, wrapped in plastic, behind a car hood and inside a refrigerator in the south end. (Tr. 87-88.)

Yet Defendant Montoya argues that the "triggering condition" did not occur because the driver did not "arrive at the subject premises listed in the warrant." (Def.'s Br. in Supp. of Mot. to Suppress [111] at 4-5.) The government contends that Montoya has engaged in a hypertechnical reading of the warrant language, and the court agrees. Johnson drove the CS

vehicle directly from the Menard's parking lot to the Montoya home, without any stops or detours. The fact that Johnson drove the vehicle past the address to the neighboring property and then began to turn around does not change things. If a guest visiting a home were to make a similar maneuver, the hostess would nevertheless get to her feet and approach the front door.

Mr. Montoya is correct that the reason for obtaining an anticipatory warrant is to ensure that circumstances support a connection between narcotics activity and Mr. Montoya's home before a search is conducted. (Def.'s Br. in Supp. of Mot. to Suppress at 5.) The CS's meeting with Johnson, at Mr. Montoya's direction, in the Menard's parking lot; the exchange of car keys; and Johnson's driving the CS's vehicle—the vehicle used for a previous marijuana transaction—directly from Menard's to the Montoya home in Crown Point, all provide that connection. In fact, the May 30 transaction might by itself have furnished probable cause for a search of the Montoya garage and home. Agents should not be faulted for taking the precaution of waiting to observe steps toward a second transaction before initiating a search.

The motion to suppress evidence seized in the search is denied.

**II.     Motion to Suppress Statements**

Defendant Montoya has also asked the court to suppress his post-arrest statements as the product of coercion and duress. Specifically, he alleges that agents threatened to arrest his wife and his daughter unless he agreed to cooperate. The court heard the testimony of Defendant Montoya, his wife, and three agents on this issue.

It is undisputed that as agents entered the garage and the house, others ran into the backyard, where Mr. Montoya and his wife, Heide Lynn Montoya, were cleaning the pool. Mrs. Montoya recalls she suddenly "heard men screaming to get down, with rifles." (Tr. 8.) Agents handcuffed Mr. Montoya and then raised him and walked him to a table on the back deck of the home, which is connected to a sunroom attached to the house. (Tr. 9.) Agents moved Mrs. Montoya to the sunroom, where she was seated just a few feet from her husband's position on

4

the deck. (Tr. 10.) She heard agents telling her husband, in English, "that he needed to cooperate or that his wife and family was going to go to jail and him, too." (Tr. 10-11.) Mrs. Montoya testified that agents told her the same thing—"that [she] was going to jail if my husband did not cooperate." (Tr. 11.) According to Mrs. Montoya, every agent of six or seven agents who "came by" her told her the same thing—that she was "going to jail." (Tr. 20.) She also testified, however, that at some point the agents "said they didn't know" whether or not Mrs. Montoya herself would be jailed. (Tr. 21.) She also testified that she did not yell or scream at the agents or complain to their supervisor, and that the agents were polite in giving her a glass of water when she requested it. She acknowledged, further, that after the initial takedown, she was never in handcuffs. (Tr. 22-23.)

Mrs. Montoya believes the charges against her husband are unfair, though she acknowledges that agents found hundreds of pounds of marijuana in the garage, and she "guess[ed]" it belonged to her husband. (Tr. 14, 16.) She testified that she had not been inside the garage for six or seven months prior to her husband's arrest and instead parked her car in the driveway because "we had a raccoon problem." (Tr. 31-32.) She saw her husband enter and exit the garage at least "a couple of times a day." (Tr. 19.) Mrs. Montoya is angry with her husband about his involvement in marijuana trafficking (Tr. 18, 27), and fearful of the persons with whom he was involved. (Tr. 28.)

Defendant Montoya similarly testified that on June 7, 2012, at 2:30 p.m., he was in the backyard of his Crown Point home, cleaning the pool with his wife, when agents arrived and ordered him to the ground. (Tr. 39.) The agents placed him in handcuffs and seated him at a table on the deck while his wife was taken to the sunroom. (Tr. 39-40.) He testified that agents told him that if he did not cooperate, he would go to jail and his wife and daughter would be arrested. (Tr. 40-41.) He agreed to cooperate because he did not want his wife or daughter jailed. (Tr. 41-42.) Montoya acknowledged signing a waiver of rights, specifically his right to

remain silent and his right to counsel, but testified that he was "so nervous and worried that I didn't even look what that paper say," and that he signed it because he did not want his family arrested. (Tr. 43, 44, 51, 52.)

After signing the waiver of rights, Mr. Montoya spoke to agents for more than two hours about his involvement in marijuana distribution and with "Roger." (Tr. 54-55.) Twice during the afternoon, agents dialed the number for "Rogelio," and handed him the phone, but there was no answer. (Tr. 42-43.) Agents asked Mr. Montoya "how I know the guy and how long I have been selling drugs." (Tr. 43.) Mr. Montoya acknowledged that he knew there were more than 900 pounds of marijuana belonging to Rodriguez in Montoya's garage and that he planned to distribute it to "the guy [who] said he would call me." (Tr. 45, 59.) He acknowledged, further, that he had arranged for delivery of 25 pounds of marijuana from his garage to the same person just a few days earlier, on May 30. (Tr. 46-47.) He also admitted that he kept a .9 millimeter gun and ammunition in the closet of his bedroom. (Tr. 48.)

In response to this testimony, the government called three witnesses who were part of the team that executed the search warrant at the Montoya home on June 7, 2012. Christopher Geer, a Special Agent with the DEA since 2003, testified that other members of the DEA's Special Response Team entered the house through the front door while he and another agent, Nick Stoll, went into the backyard with their weapons drawn. (Tr. 62, 65-66, 68.) Agents Geer and Stoll ordered the man and woman standing in the backyard to the ground and secured them with handcuffs. (Tr. 66-67.) Geer testified that he did not have a conversation with Mr. Montoya and that Mr. Montoya's wife asked why the agents were there and what was going on. (Tr. 68.) Geer took Mr. Montoya and his wife to the porch and "turned them over to the investigating team." (Tr. 69.) Geer was not involved in interviewing Mr. Montoya or his wife or daughter, but he recalled that they were cooperative. (Tr. 70.) He did not hear law enforcement agents raise their voices at any time and did not observe Mr. Montoya or his wife or daughter crying. (Tr.

6

71.) Geer did not tell Mr. Montoya or his wife or daughter that they would be jailed if Montoya did not cooperate, and he did not hear any other agent make such statements or threats. (Tr. 71-73.)

Agent Todd Smith himself arrived at the scene just as two other agents arrested Johnson, who was then taken to the surveillance van that Smith had been driving. (Tr. 83-84.) Johnson told Smith that he "was working for Mr. Montoya" and that "Mr. Montoya had instructed him to go over and pick up this vehicle." (Tr. 85.) After interviewing Johnson for about 20 minutes, Smith went to the backyard of the Montoya home, where Smith observed Mr. Montoya, his wife, and his daughter seated at a picnic table. (Tr. 85.) Smith introduced himself and showed Mrs. Montoya his credentials. (Tr. 86-87.) He explained that the agents had a search warrant and had seized "a quantity of marijuana in the garage." (Tr. 87.)

After finding bundles of marijuana in Mr. Montoya's garage, Smith and Special Agent James Proud escorted Mr. Montoya to the back porch of his residence. (Tr. 88.) As Agent Proud read Mr. Montoya his constitutional rights from a pre-printed card, Agent Smith observed that Mr. Montoya "appeared tired" and "a little angry." (Tr. 88-89.) Smith told Mr. Montoya about the seizure of marijuana from the garage, "that he had been surveilled on numerous occasions," and that agents had arranged and observed the marijuana transaction a week earlier. (Tr. 89.) Mr. Montoya did not deny any of those events. He acknowledged responsibility for "everything in the garage" and said that his wife did not have access to it. (Tr. 90.) Mr. Montoya initially told Smith that "he worked for Mr. Johnson," but after being challenged, "changed his story." (Tr. 90-91.) Appearing nervous, but willing, Mr. Montoya attempted to cooperate with agents by making two attempts to call Rodriguez, but both calls went to voicemail. (Tr. 91-92.) Smith testified that he heard no screaming, yelling, or raised voices during the entire time he was at the Montoya home. (Tr. 93-94.) He did not hear other agents threaten Mr. Montoya's wife and daughter with arrest if Montoya refused to

7

cooperate, and testified that intimidation or coercion is "unacceptable behavior." (Tr. 94-95.) Smith acknowledged, however, that had such conduct occurred prior to his arrival, his subordinates "[p]otentially" would be unwilling to disclose that they had engaged in it. (Tr. 103.) He acknowledged, as well, that Mr. Montoya could have been removed from the scene immediately and questioned in some other location. (Tr. 105.)

Special Agent Justin Williams was involved in the investigation and engaged in surveillance of the meeting at Menard's. (Tr. 110-111.) He arrested Shawn Johnson outside the Montoya home in Crown Point and, after remaining with Johnson for about half an hour, entered the home, where he encountered Mrs. Montoya, who appeared to be "upset" but "casual in conversation." (Tr. 111-112.) Mrs. Montoya denied knowing Mr. Johnson and expressed concern about the possibility that other persons "her husband was dealing with . . . knew where they lived" and might come to the house. (Tr. 113-114.) She told Agent Williams that her husband had a pistol in the closet in the master bedroom, and Williams found and recovered it. (Tr. 114-115.) Williams testified that there was a strong odor of marijuana coming from the garage, and that he found multiple bundles of marijuana behind a car hood and stacked in a refrigerator. (Tr. 116-117.) Williams testified that he read *Miranda* warnings to Mr. Montoya and observed Mr. Montoya initial the form. (Tr. 118-120.) Mr. Montoya was upset and embarrassed, Williams noted, and "[h]e basically just asked me to keep him on the side so that his wife couldn't see him." (Tr. 118, 120.) Williams heard no raised voices from the agents or from the Montoyas, and he heard no agents tell Mr. Montoya or his wife or daughter that the wife or daughter would be jailed if he refused to cooperate. (Tr. 122-123.)

Agents Smith, Geer, and Williams were candid and credible. Each testified that he had not heard or made threats that Defendant's wife and daughter would be jailed if Defendant failed to cooperate. Defendant Montoya signed a *Miranda* waiver and had ample reasons to agree to cooperate that were unrelated to any such threats: he knew agents had entered (or were

8

entering) his home and garage with a warrant, and he knew about the hundreds of pounds of marijuana stashed in the garage. He had arranged for Johnson to pick up a substantial quantity of marijuana from the garage and could anticipate (if not actually observe) Johnson's arrest and potential interrogation. And even absent any threats from agents, Defendant undoubtedly desired to protect his wife and daughter from suspicion.

Yet Defendant is correct that the three agents' testimony does not fully rebut the Montoyas' account. It is undisputed that agents were at their home for several hours. None of the government's three witnesses was present throughout the afternoon. By Agent Smith's own testimony, there may have been as many as 15 to 20 agents on the scene. Smith himself never suspected the wife or daughter of involvement in the marijuana stash, but there was no evidence concerning how well-briefed other members of the team were. One or more might have known nothing more than that hundreds of pounds of marijuana had been discovered in the garage. In these circumstances, it would not be surprising for an officer to view everyone in the house as a suspect, and perhaps even to tell the residents, "If you don't tell us who this belongs to, you're all going to jail."

The court does not suggest this scenario is likely—only that it is possible. The Montoyas have obvious reasons to manufacture or embellish their account of the events of June 7, 2012. Their failure to identify, by name or physical description, even one of the officers who allegedly made threats is disappointing. The court categorically rejects their assertion that every one of the officers did so. Moreover, the court credits the testimony of Agent Geer that he made no threats to the Montoyas at the time he encountered them in the backyard over the statements in the Montoyas' affidavits (withdrawn, to some degree, during the hearing) that agents began uttering threats "[a]lmost immediately." Nevertheless, in light of the very large number of agents involved in the Montoya arrest, before making a final ruling the court will accept the government's offer to call additional agents and officers to testify on this issue. (Gov'ts Post-

9

Hr'g Mem. [112] at 14.)

### III. Motion for Severance

If the court denies Defendant Montoya's motion to suppress his post-arrest statement, the government intends to use it at trial. The statement would be admissible against Montoya even if he does not take the stand and make himself available for cross-examination. The statement is not admissible against Defendant Rodriguez, but because it also implicates him, Rodriguez has asked for a severance or for a separate jury to decide his case. The government objects to either form of relief, arguing that Montoya's statement can be redacted in such a way as to eliminate any undue prejudice to Rodriguez.

The parties agree as to the law on this issue. Defendants named in the same indictment are ordinarily tried together, but as recognized in the rules of procedure, the court has discretion to grant a severance if "joinder . . . appears to prejudice a defendant . . . ." FED. R. CRIM. P. 14(a). Where there is a serious risk that a joint trial would compromise a defendant's trial rights or interfere with the jury's ability to make a fair determination, severance is appropriate. *See Zafiro v. United States*, 506 U.S. 534, 539 (1993). In *Bruton v. United States*, the Supreme Court held that a defendant's Sixth Amendment right to confront witnesses against him is violated when the confession of a nontestifying co-defendant implicating the defendant as a participant in the crime is admitted in a joint trial of both defendants. 391 U.S. 123, 137 (1968). If Defendant Montoya does not take the stand, the jury's consideration of his statement as against Defendant Rodriguez would violate Rodriguez's rights under the Confrontation Clause to confront the witnesses against him. U.S. CONST. amend. VI; *Lilly v. Virginia*, 527 U.S. 116, 143 (1999) (Scalia, J., concurring) (characterizing admission of a nontestifying accomplice's confession as a "paradigmatic Confrontation Clause violation").

Severance is not required in every case in which co-defendant's confession is admitted, however. The Supreme Court has approved the practice of redacting a statement so as to

eliminate any obvious reference to a defendant, and giving limiting instructions, as sufficient to protect a defendant's Confrontation Clause rights. In *Richardson v. Marsh,* 481 U.S. 200 (1987), the court found no Confrontation Clause violation where the co-defendant's confession was redacted to eliminate not only the defendant's name, but any reference to her existence. *Id.* at 211; *see also Gray v. Maryland*, 523 U.S. 185, 196 (1998) (approving, in dictum, replacement of names in a confession with "a few other guys" to avoid a *Bruton* problem); *United States v. Benabe*, 436 Fed. App'x 639, 647 (7th Cir. 2011) (approving use of the expression "another gang member" rather than defendant's name); *United States v. Green*, 648 F.3d 569, 573, 574 (7th Cir. 2011) (in what the court recognized as a "close case," approving a redaction that referred to the defendant generically as the "straw buyer" though the jury could have "[p]ut[] . . . pieces together" to conclude that appellant was the "straw buyer"); *United States v. Sutton*, 337 F.3d 792, 799 (7th Cir. 2003) (approving the substitution of expressions like "another individual" or "other person" for the name of the defendant).

The government contends that Montoya's post-arrest statement can be effectively redacted to eliminate prejudice to Rodriguez, but the court is less certain. In its current form, Montoya's post-arrest statement makes extensive reference to Defendant Johnson and to Defendant Rodriguez. As this court understands the law, an acceptable redaction must eliminate any "one-to-one correspondence between the confession and easily identified figures sitting at the defense table*." United States v. Hoover,* 246 F.3d 1054, 1059 (7th Cir. 2001). The individuals identified in Montoya's statement, it appears, will readily correspond to Johnson (who has pleaded guilty and may well testify at this trial) and to Rodriguez. Should the government elect to use the statement at trial, the court will require a proposed redacted version at least ten days before jury selection. Unless the redactions are so substantial as to eliminate any obvious

11

identification of Defendant Rodriguez, the court will be inclined either to bar its admission or to grant Rodriguez's request for a double jury.

ENTER:

Dated: November 19, 2013

_____
REBECCA R. PALLMEYER
UNITED STATES DISTRICT JUDGE